IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| T.H.E. INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>MAX-AIR PRODUCTIONS, INC., THE ESTATE OF KELLY WINN, THOMAS CARNIVAL, and CRAIG PETERSON,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER<br><br><br>Case No. 2:04CV150 DAK |

This matter is before the court on Defendant Max-Air Productions, Inc. ("Max-Air") and

Craig Peterson's Motion for Partial Summary Judgment (in which Defendants Thomas Carnival,

Inc. and the Estate of Kelly Winn join) and also on Plaintiff T.H.E. Insurance Company's

("T.H.E.") Motion for Summary Judgment.  A hearing on the motions was held on March 18,

2005.  At the hearing, Defendants were represented by Alan C. Bradshaw.  Plaintiff was

represented by Gary L. Johnson and Melinda A. Morgan.   Michael Katz and Preston L. Handy

were present on behalf of the Estate of Kelly Winn, and Robert L. Janicki was present on behalf

of Thomas Carnival, Inc.  Before the hearing, the court considered carefully the memoranda and

other materials submitted by the parties.  Since taking the motions under advisement, the court

has further considered the law and facts relating to the motions.  Now being fully advised, the

court enters the following Memorandum Decision and Order.

## I.  UNDISPUTED FACTS

This case arises out of the tragic accidental death of Kelly Winn ("Winn"), a professional

snowboarder, at a Max-Air Snowflyers Big Air Show in June 2003.  At issue in the instant

motions is whether the insurance policies obtained by Max-Air through T.H.E. insurance provide

coverage for the accident.  Max-Air, its President and owner Craig Peterson ("Peterson"),

Thomas Carnival, Inc. ("Thomas Carnival") and the Estate of Kelly Winn claim that the

Automobile Policy (the "Auto Policy") provides coverage, and if not, then the Commercial

General Liability Policy (the "CGL Policy") provides coverage.   T.H.E., on the other hand,

argues that neither policy provides coverage because, among other reasons, there is an employee

exclusion in both policies, and Winn was an employee of Max-Air.  Max-Air, however, contends

that the employee exclusion does not apply because Winn was an independent contractor–not an

employee.

**Max-Air's Business**

Max-Air is in the business of presenting dry-land aerial ski, snowboard, and trampoline

shows.  For its Road Shows, it transports its equipment on a semi-trailer.  Max-Air is a small,

"one man" operation, which during the relevant time frame presented shows approximately 50

days per year, mostly during the late summer and early fall.[1]  Max-Air contracts with Olympic

athletes and professional skiers and snowboarders.  Performers work a limited number of days

---

[1]  T.H.E. asserts, however, that Max-Air does not employ seasonal or short-term workers. Rather, it claims, Max-Air puts on shows across the country throughout the year, and it does not depend on the weather or a season.   T.H.E. however, has not created a genuine dispute that most of the shows are during the late summer and early fall or that Max-Air employees short-term workers.

per year when their individual schedules permit, and they are retained pursuant to short-term

written contracts ("Performer's Engagement Agreements") that cover the few days of a trip or an

individual performance.  These short-term contracts are the only type of contracts ever entered

into by Max-Air with performers.  Performers regularly tell Max-Air that they are unavailable to

perform at a particular show, and Max-Air never commits to provide a performer with any

minimum level of work or income.

These contracts expressly state that performers are "independent contractors."[2]   Winn

signed at least ten Performer's Engagement Agreements from 2000 through 2002.   During the

time that he performed for Max-Air, he also performed in shows for Max-Air's competitors.[3]

Similar to other Max-Air performers, Winn was not insured by Max-Air, and any insurance he

obtained was obtained on his own.  Max-Air did not pay payroll or social security taxes, provide

employee benefits, or contribute to unemployment insurance or workers' compensation on

behalf of Winn.  Max-Air does not sign Performance Engagement Agreements with performers

---

[2]  Indeed, during the years that Winn performed at Max-Air shows, he worked as a W-2
employee for several businesses including Solitude Ski Corporation, Snowbird Corporation,
Warburton's Inc. and Quality Pool & Spa, Inc.

[3]  T.H.E. contends that there is a disputed issue regarding the freedom of performers to
compete for Max-Air's competitors.  T.H.E. bases this dispute on the non-compete provision and
the trade secret section of the Performance Engagement Agreement.  Max-Air has set forth
evidence that the non-compete provision prohibits the performers only from contracting directly
with Max-Air's clients, thereby undercutting the price.  It does not prohibit the performers from
contracting with competitors.  T.H.E. has not disputed this fact.  Also, Max-Air has provided
undisputed evidence that although there is a trade secret provision in the contract, Max-Air does
not claim to have any trade secrets.  In any event, there is no dispute that Winn performed for
Max-Air competitors between the time of his first Max-Air show in October 2000 and his death
in June 2003.

unless they already possess the skills necessary to professionally perform aerial routines.  Like other Max-Air performers, Winn choreographed the routines he performed at Max-Air shows.  Max-Air's only input regarding performance at shows is to decide the number of jumps and the order of performance as between snowboard, ski, or trampoline routines.   Once Max-Air designates the order by type of routine, the individual snowboarders decide what maneuver to perform and the order of performance among the snowboard performers.

Max-Air arranges for the travel and lodging of its performers.  It also provides the jump ramps, trampolines, stages, landing bags, and costumes.  However, most of the personal tools and instrumentalities of a performers (such as their snowboards) are largely provided by sponsors.  Approximately 90% of the boots used by the performers are supplied by the performers, and the few pairs obtained from the sponsor were permanently assigned to individuals.  In addition, the matching clothing worn by performers was also generally provided by sponsors.

**Expo 2003 Show**

Max-Air had contracted with Thomas Carnival to present shows at the Bismark Civil Center "Expo 2003" in Bismark, North Dakota in June 2003.   The Max-Air/Thomas Carnival contract states: "performers are not servants, employees, agents or representatives of [Thomas Carnival] and are not [Max-Air's] servants, employees, agents or representatives.  They are in fact subcontractors. . . ."  The contract also states: "[Max-Air] will exonerate, indemnify and hold harmless the Thomas Carnival and Expo 2003 . . . from and against any liabilities, obligations and actions arising out of the performance of [Max-Air] under this agreement."

Winn had agreed to perform at the show and had agreed to sign a standard Performer's

Engagement Agreement similar to the other agreements he had previously signed.  Although

Winn had not yet signed this particular Agreement prior to the accident, the lack of a signed

agreement is not an issue in this case.

On June 4, 2003, Max-Air was setting up for the "Expo 2003" show.  A part of the set-up

process, a four-story "jump ramp" was hydraulically raised from a flat-bed trailer.  Peterson was

operating the hydraulic lifts to raise the "jump ramp."  While Peterson was operating the lifts,

Winn, who was assisting with the set up of the jump ramp, was electrocuted and died.  The State

Forensic Examiner for the North Dakota Department of Health determined that Winn died of

electrocution and that the manner of death was an "accident."

**The Max-Air Insurance Policies**

T.H.E. Insurance Company ("T.H.E.") is a company engaged in the business of selling

insurance.  Max-Air had obtained from T.H.E. a $1,000,000 Auto Policy and CGL Policy,

effective June 3, 2003 through June 3, 2004.  At all relevant times, the insureds under the Auto

Policy included Max-Air and Peterson.  Thomas Carnival was also an insured for the period

beginning June 4, 2003 through June 8, 2003.

The Auto Policy provides coverage for specifically designated "autos."  The auto

involved in the Accident was a specifically scheduled auto.  The Auto Policy states that T.H.E. is

obligated to pay Max-Air amounts that Max-Air "legally must pay as damages because of

'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and

resulting from the ownership, maintenance or use of a covered 'auto.'"  T.H.E. has denied

coverage under the Auto Policy on the basis that Winn was allegedly an "employee" of Max-Air,

and the Auto Policy excludes coverage for injuries to "employees" of Max-Air.[4]

The Auto Policy defines the term "Employee" as follows:

> "Employee" includes a "leased worker."  "Employee" does not include a "temporary worker."

Ex. D to Peterson Decl., Auto Policy at § V Para. F.

The Auto Policy defines "Temporary Worker" as follows:

> "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

*Id.* at Auto Policy § V ¶ O.

**The Parties' Claims**

In this action, Max-Air and Peterson have filed four counterclaims.  First, they seek

---

[4]  The exclusion reads in relevant part:

> This insurance does not apply to any of the following:
>     . . .
>         4.  **Employee Indemnification and Employer's Liability**
>             "Bodily injury" to:
>             A.      An "employee" of the "insured" arising out of and in the course of:
>                 (1)     Employment by the "insured"; or
>                 (2)     Performing the duties related to the conduct of the "insured's" business;
>     . . .
>
> But this exclusion does not apply . . . to liability assumed by the "insured" under an "insured contract."

Exhibit D to Peterson Decl., Auto Policy at § II ¶ B.4.a

declaratory judgment regarding the obligations of T.H.E. to defend and indemnify Max-Air, Peterson, and Thomas Carnival in the underlying action.  They claim that the Automobile Policy unambiguously provides coverage for the liability of Max-Air, Peterson, and Thomas Carnival to the Estate of Kelly Winn.  In the alternative, to the extent coverage is not provided under the auto coverage part of the T.H.E. Policy, they assert that coverage is provided under the CGL policy.   The Max-Air Defendants also assert claims for breach of contract, breach of fiduciary duty/bad faith, and breach of the covenant of good faith and fair dealing, but these claims are not at issue in Max-Air and Peterson's Motion for Partial Summary Judgment, which pertains solely to their claim for declaratory judgment.

T.H.E., on the other hand, seeks a declaration that the undisputed facts and the law show that Max-Air's workers are not independent contractors, but rather company employees.  Thus, it seeks a declaration that Winn is not covered by either the Auto Policy or the CGL Policy.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©;  *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In reviewing the factual record, we construe all facts and make reasonable inferences in the light most favorable to the non-moving party.  *See Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir.1998).

**III.    DISCUSSION**

The court finds that the claims of the Estate against Max-Air, Peterson, and Thomas

Carnival are covered under the terms of the Auto Policy.

**1.  Applicable Rules of Contract Interpretation**

In making its determination, the court has considered several important rules of contract

interpretation, including the particular rules applied to insurance contracts.[5]   For instance,

clauses excluding activities from coverage are to be strictly construed against the insurer.

*Sawson v. Sawson*, 840 P.2d 749, 750 (Utah 1992).  Anything that "is not clearly excluded from

the operation of [an insurance] contract is included in the operation thereof."  *LDS Hosp. v.*

*Intermountain Health Care*, 765 P.2d 857, 859 (Utah 1988).   If the language functions as a

limitation, exception, or condition to coverage, then it "must be made and established by the

insurer to escape liability thereunder."  *Id.*

In addition, in determining whether language in a contract is ambiguous or unambiguous,

the court can consider "the writing in light of the surrounding circumstances" and "all credible

evidence offered to prove intention."  *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268

(Utah 1995).  The Utah Supreme Court considers "the parties' actions and performance as

evidence of the parties' true intention."  *WebBank v. American General Annuity Corp.*, 54 P.3d

1139, 1145 (Utah 2002).   Finally, if the language in an insurance contract has two or more

reasonable interpretations, *i.e.*, is ambiguous, then such "provisions are usually construed against

the insurer without respect to extrinsic evidence, because insurance contracts are ordinarily

---

[5]  The parties do not dispute that Utah law controls the court's analysis.

standard forms, whose language is not negotiated by the parties." *Home Savings & Loan v.*

*Aetna Cas. & Sur. Co.*, 817 P.2d 341, 347 (Utah 1991).

> **2.      The Estate's Claims Are Covered Under the Auto Policy Because Winn Was a Temporary Worker As Defined in the Auto Policy**

T.H.E. concedes that all prerequisites to a covered loss, including that Max-Air, Peterson,

and Thomas Carnival are "insureds," that the semi-trailer involved in the accident is a covered

vehicle, and that the Estate's claims arise out of the accident involving Max-Air's use of this

covered vehicle.  Thus, the only question is whether Winn is an "employee" of Max-Air and

therefore excluded under the policy.

Max-Air's Auto Policy excludes an "employee," which includes a "leased worker," but

does not include a "temporary worker."  The Auto Policy states that a "'[t]emporary worker'

means a person who is furnished to you to substitute for a permanent 'employee' on leave or to

meet seasonal or short-term workload conditions."  Ex. D to Peterson Decl., Auto Policy at § V ¶

F.   The court finds that Winn was a "temporary worker," as expressly defined and therefore he

is not an "employee."[6]

There is no genuine dispute that Max-Air's  business is seasonal and short-term.   Max-

Air presents only 50 show per year on average, mostly during the late summer and early fall. In

addition, performers, including Winn, work on a contract-to-contract basis for Max-Air without

---

[6]  The court finds no merit to T.H.E.'s argument that Winn is not a temporary worker
because he was not "furnished to" Max-Air by a temporary agency.   If T.H.E. had intended such
a requirement, it could have so stated.  Indeed, T.H.E., in defining a "leased worker" explicitly
stated that a "leased worker" means "a person leased to you *by a labor leasing firm* under an
agreement between you and the labor leasing firm, to perform duties related to the conduct of
your business."  Ex. D to Peterson Decl., Auto Policy at § V ¶ I.

future obligations by either the performer or Max-Air.  The contracts are signed for short-term

performances, and each engagement lasts only a matter of days.  Winn has held other jobs during

the time he performed for Max-Air, and he performed for Max-Air's competitors.  Thus, the

"employee" exclusion does not apply.

> **3.      Even If Winn Is Not Considered a "Temporary Worker," the Policy is
> Ambiguous in Only Partially Defining "Employees," and Max-Air Offers a
> Reasonable Interpretation of the Policy**

The court finds that the term "employee" is only partially defined.  It includes a "leased

worker" but does not include a "temporary worker."  A "leased worker" is defined as follows:

> "Leased worker" means a person leased to you by a labor leasing firm
> under an agreement between you and the labor leasing firm, to perform duties
> related to the conduct of your business.  "Leased worker" does not include a
> "temporary worker."

*Id.* § V ¶ I.

Max-Air contends that if Winn is not a "temporary worker" then the Auto Policy's partial

definition of "employee" fails to provide guidance and is ambiguous.  Once ambiguity is found,

coverage exists under Utah law because the word "employee" will be read as a layperson

without reference to restrictive legal meaning.  Coverage must be found as long as the reading

offered by Max-Air is one "reasonable" reading from a lay perspective.  *See Home Sav.*, 817

P.2d at 347 (if provision is subject to more than one reasonable interpretation, then provision

will be read in favor of coverage without resort to extrinsic evidence).  Max-Air claims that it is

"reasonable" to read the Auto Policy as not including Winn within the category of  "employees"

considering the express contractual agreement between the parties that Winn would be an

independent contractor.  Similarly, Max-Air and Thomas Carnival expressly agreed that all

10

performers would be "subcontractors" and not employees."

### 3.       In Any Event, Winn Was An Independent Contractor Under Any Legal Standard, and Therefore, the "Employee" Exclusion Does Not Apply

Even if Winn is not considered to be a "temporary worker" who is not excluded under the

policy, and even if the definition of "employee" was not found to be ambiguous, the court agrees

with Max-Air and Peterson that the undisputed facts demonstrate that Winn was not an

"employee" under any legal standard.  The Utah Supreme Court has stated:

> An employee is one who is hired and paid a salary, a wage, or at a fixed rate, to perform the employer's work as directed by the employer and who is subject to a comparatively high degree of control in performing those duties.  In contrast, an independent contractor is one who is engaged to do some particular project or piece of work, usually for a set total sum, who may do the job in his own way, subject to only minimal restrictions or cotnrols nad is responsible only for its satisfactory completion.

*Graham v. R. Thorne Foundation*, 675 P.2d 1196, 1198 (Utah 1984).  Utah follows the

Restatement of Agency in drawing the independent contractor/employee line and the "main

facts" to be evaluated are the following:

> (I) whatever covenants or agreements exist concerning the right of direction and control over the employee; (ii) the right to hire and fire; (iii) the method of payment (*i.e.*, wages versus payment for a completed job or project); and (iv) the furnishing of equipment.

G*lover v. Boy Scouts of America*, 923 P.2d 1383, 1385-86 (Utah 1996).

In this case, the parties expressly agreed that Winn would be an independent contractor at

the time of his four-day engagement.  While not dispositive, the agreements must "be given

some effect."  *Christean v. Industrial Comm'n*, 196 P.2d 502, 506 (Utah 1948).  Further, Max-

Air did not retain any right to control the essential aspects of what Winn was retained to do.  It is

undisputed that Winn choreographed his own snowboard routines.  While performers did assist

with set up, that task is merely incidental to the fundamental retention of Winn to perform as a

professional snowboarder.

Max-Air correctly points out that federal cases applying the Restatement of Agency

standards adopted in Utah have generally held that skilled art or entertainment professionals are

independent contractors, even if the alleged "employer" provides some direction as to the details

of a performance or the materials necessary to the performance.  In *Lerohl v. Friends of*

*Minnesota Sinfonia*, 322 F.3d 486, 490 (8th Cir. 2003), the court explained the relevant "control"

inquiry when dealing with skilled art or entertainment professionals such as musicians:

> [M]usicians . . . are highly skilled professionals who own their own
> instruments and need no on-the-job training other than rehearsals to perform in a
> variety of musical settings.  Obviously, professional musicians have the option of
> becoming employees of a particular band or orchestra. . . . But [some] musicians
> may prefer to remain "free-lance" committing themselves to no client and
> retaining the discretion to pick and choose among available engagements, much
> like lawyers, accountants, and business consultants who choose private practice
> instead of "in house" employment. . . . [C]ases applying the common-law agency
> test have recognized this freedom-of choice principle. . . . [T]his is the relevant
> control issue, not whether [the conductor] could tell [the musicians] where to sit
> and when to play during a concert or rehearsal. . . . [T]he "key distinction"
> between [an employee and an independent contractor] is whether [the] musicians
> retained the discretion to decline particular . . . concerts and play elsewhere."

*Id.* at 492.  Winn was a "free-lance" performer who independently performed for Max-Air and

its competitors, competed in snowboard competitions, and provided snowboarding instruction.

Max-Air had no ability to control whether or to what extent performers work in the first place.

Max-Air performers could decline invitations from Max-Air and Max-Air could choose not to

engage a performer whom it had used in the past.

Regarding the method of payment, Winn was engaged to do a particular short-term

project for a set total sum.  Performers also understood that they had to provide their own

insurance.  While Max-Air did provide some of the equipment, including the jump ramps and

landing bags, most of the personal tools and instrumentalities of a performers (such as their

snowboards) were largely provided by sponsors.  Approximately 90% of the boots used by the

performers are supplied by the performers, and the few pairs obtained from the sponsor were

permanently assigned to individuals.  In addition, the matching clothing worn by performers was

also generally provided by sponsors.

In evaluating the foregoing factors and looking at "intent of the parties and the business

of the employer," *Glover*, 923 P.2d at 1386, the court finds that Winn was not an "employee"

and is therefore not excluded under the Auto Policy.

    **5.**        **Max-Air Has Coverage Even If Winn Is Considered An "Employee" Based Upon Max-Air's Obligation to Indemnify Thomas Carnival**

According to Max-Air, the "employee" exclusion contains a broad exception.  It states:

> But this exclusion does not apply . . . to liability assumed by the
> "insured" under an "insured contract."

Ex. D to Peterson Decl., Auto Policy at § II.A.4.  The Auto Policy defines an "Insured Contract"

as:

> That part of any other contract or agreement pertaining to your business . . . under which
> you assume the tort liability of another to pay for "bodily injury" . . . to a third party or
> organization.  Tort liability means a liability that would be imposed by law in the absence
> of any contract or agreement.

*Id.* at § IV.H.5.  Applying these terms, Max-Air has entered into an "insured contract" by

agreeing to indemnify and hold harmless Thomas Carnival.  Thus, Max-Air is entitled to

insurance coverage to this extent even if Winn is considered an "employee" of Max-Air.[7]

### III.  CONCLUSION

Accordingly, for the foregoing reasons, IT IS HEREBY ORDERED that Defendants Max-Air Productions, Inc. and Craig Peterson's Motion for Partial Summary Judgment [docket # 40] is GRANTED.  In addition, Defendants Thomas Carnival's Motion Joining in Max-Air and Peterson's Motion  [docket # 43] is GRANTED, and the Estate of Kelly Winn's Motion Joining in Max-Air and Peterson's Motion [docket #44] is GRANTED.  T.H.E.'s Motion for Summary Judgment [docket # 52] is DENIED.  The claims of Kelly Winn's Estate against Max-Air, Peterson, and Thomas Carnival are covered under the Auto Policy.

DATED this 5th day of May, 2005.

_____

DALE A. KIMBALL
United States District Judge

---

[7] Because of the court's determination regarding the Auto Policy, it is not necessary to address the parties' arguments pertaining to the CGL Policy.